## Cox v. Commonwealth.

(Decided June 19, 1925.)

### Appeal from Whitley Circuit Court.

1.  Criminal Law—Witnesses—Commonwealth May Attack Defendant's Reputation, where he has Offered Proof Thereof, and May Cross-Examine Defendant's Witnesses, to Test Memory and Extent of Information.—Defendant having offered proof of his good

reputation, Commonwealth had right to attack it, if possible, and was properly permitted to cross-examine defendant's character witnesses, for purpose of testing their memory and extent of their information.

2. Witnesses—Question to Defendant, as to Whether he Made a Certain Statement, Properly Excluded, where Statement Not in Language Testified to.—Where state's witness testified that defendant had said to him, "I don't know what made me do it" (referring to killing of deceased), question to defendant, as to whether he said, "I don't see what made him do it," was properly excluded, as statement contained in question was not that to which state's witness had testified.

3. Witnesses—Question Held Properly Excluded, as Leading.—Question to witness, on direct examination to "tell the jury if C. said there, in your presence and in the presence of P., 'I don't know what made me do it,' " was properly excluded, as leading.

4. Homicide—Detailed Account of Shooting of Another by Deceased Held Properly Excluded.—In murder prosecution, detailed account of shooting of another by deceased was properly excluded, and court properly limited witnesses, to state in general way that deceased had had trouble with such other, and had shot him.

5. Homicide—Argument of Special Prosecutor Held Not to have Prejudiced Substantial Rights of Defendant.—Where alleged improper argument of special prosecutor was made in effort to get jury to inflict death penalty, but sentence of life imprisonment only was inflicted, held, that such language did not prejudice rights of defendant, and reversal cannot be had, in view of Criminal Code of Practice, sections 340, 353.

6. Criminal Law—Formation of Jury Not Subject to Exception.—Under Criminal Code of Practice, section 281, questions of formation of jury are not subject to exception; no challenge to panel having been made.

7. Criminal Law—Alleged Misconduct of Special Prosecutor, Not Contained in Bill of Exceptions, Not Considered.—Alleged misconduct of special prosecutor, not contained in bill of exceptions, cannot be considered.

8. Criminal Law—Alleged Newly Discovered Evidence Not Considered, where no Affidavit Setting it Out, Nor Any Affidavit of New Witness Field.—Alleged newly discovered evidence cannot be considered, where defendant did not file affidavit setting it out, nor file any affidavit of any new witness.

9. Homicide—Evidence Held to Sustain Conviction.—Conviction of murder held not flagrantly against law and evidence.

STEPHENS & STEELY for appellant.

FRANK E. DAUGHERTY, Attorney General, and GARDNER K. BYERS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Affirming.

The appellant's punishment for the murder of Grover Sharp was fixed at life imprisonment, and he appeals. This homicide took place on Main street in the city of Williamsburg on April 16, 1924. Appellant is a resident of Williamsburg, and engaged in the barber business. He runs a Ford car, and was accustomed to do taxi work when not busy in his barber shop. On April 15, he carried a party of promoters from Williamsburg to a point near Cumberland Falls, and was expecting to take another member of this party to the same place on the 16th:

While appellant was at home at lunch time, one Grover Sharp, a railroader by profession, who lived at Savoy, a small railroad junction about one mile south of Williamsburg, came into town. We do not know just what caused it, but for some reason, Sharp ran amuck. He seemed to take his particular spite out on a boy named Cecil Evans. Sharp was finally overpowered by some officers and citizens, and three pistols were taken off of him. When Cox came back from lunch and saw his shop had been torn up and glass and blood on the floor he made some inquiries about what had caused it. According to some of the witnesses, Cox asked the barbers who worked for him, "Why didn't you beat the devil out of him?" There was evidence that he said, "No man can do that to my shop and get away with it." Also, "If he don't pay for this, he will have trouble with me. If I had been here I would have killed the —— —— ——."

All the witnesses agree that Cox opened a drawer, combed his hair and according to some of them, took a pistol out of the drawer, and went out. He said to some of the witnesses: "I'll go and hunt him up. I'll go right to the jail to him." Cox left his shop for the purpose, as he said, of going to the bank to get some change; but it may have been he left the shop to go to the jail, as according to the direction he took, he could have been going to either place.

On the way, he saw Sharp coming up the street. There was a man with Sharp whom Cox said he did not know, but who was in fact a deputy sheriff. Sharp's hand was bleeding from the cuts he had received when he broke the door out of the barber shop, and after he

was arrested, he asked the sheriff to send him to a doctor for the purpose of having his hand dressed. Sharp and the deputy sheriff were on their way to a doctor when Cox met them. Cox and Sharp said a few words to each other, then Cox turned and started back up Main street with Sharp and the deputy sheriff, Taylor. The three men walked along the sidewalk abreast, Taylor being on the right hand side, next to the building, Sharp being in the middle, and Cox being on the outside of the sidewalk, next the street. About sixty feet from the corner, there was a piece of furniture, or some like obstruction on the sidewalk next the building, and in order to pass that, Taylor stepped ahead of the other two. Thereupon Cox drew his pistol, put it in Sharp's ear and fired, and continued to shoot rapidly, until his pistol was empty. Four balls took effect in Sharp's body—one in his ear, one in his chest about an inch or two to the left of the nipple, one just below his left shoulder blade. A fourth was a glancing shot in the head, which did not enter the skull. Sharp fell and died instantly.

Cox insists that the only reason that he met Sharp in the street was because Sharp motioned to him to come over there, and that when Sharp met him he said, "I tried to kill a damn dog in your place, and shot some glass out." Cox said, "Yes, I heard about it." Sharp then replied, "Let's walk back up and see about it." They turned to go back for that purpose. As they walked along, Sharp said to Cox, "I suppose the glass will cost something like $1.00 or $1.50." to which Cox replied that a big glass like that would be apt to cost about $7.00 or $8.00. At that point, so defendant says, Sharp wheeled toward him, and moved his left hand as if to draw a pistol. When the sheriffs disarmed Sharp they left on him a hip holster, and Cox said he saw that and supposed that Sharp was endeavoring to draw a pistol, whereupon he drew his and shot just as fast as he could. Taylor, the deputy sheriff, who was with Sharp, said that he never heard either of the men say anything to the other. Several witnesses said Sharp did not wheel or turn at all. Other witnesses say that he did wheel, or turn toward Cox. The location of these wounds, one in Sharp's left chest, one in his left ear, another in the left side of his head, and another just below his left shoulder blade, indicates that those witnesses who say Sharp did not turn were telling the truth about it. All the witnesses say that Sharp fell forward and there is no

dispute about the position his body occupied upon the sidewalk after he fell. He was on his face and his head was a little closer to the wall of the building than his feet, all of which would indicate that he was shot as he walked along, and fell forward, as the witnesses stated. If he was shot as he walked along, and without having said anything to Cox, this was a deliberate and cold-blooded murder, and whether or not he was so shot was a question for the jury. The jury found him guilty and the appellant now complains, first that the court misinstructed the jury; but we have carefully examined the instructions, and find nothing in them to support that contention.

Second, he complains that the court permitted incompetent and prejudicial evidence to be introduced by the Commonwealth, over his objection. The appellant had introduced Marsh Lovit, Sherman Rowe and Bond Stewart, by whom he had shown that he enjoyed a good reputation among his neighbors, associates and acquaintances for peace and good order. On cross-examination, counsel for the Commonwealth asked Rowe the following questions:

"Q. 1. You say his reputation for peace and quietude is good? A. Yes, sir.

"Q. 2. Had you heard about his undertaking to shoot Ves Barnhill in his place at Jellico? A. No, sir.

"Q. 3. Had you heard about his shooting up a barber shop at Clairfield, Tenn? A. No, sir.

"Q. 4. Had you heard about his shooting Gilce Croley and all these things just mentioned? A. No, sir."

To each of these questions the defendant objected; his objections were overruled and he excepted. The same questions were propounded to Lovit, with the same answers, objections and exceptions. If the defendant had not put his good reputation in evidence, the Commonwealth could not have asked these questions, but when he offered proof of his reputation, the Commonwealth then had the right to attack his reputation if possible, and it also had the right to interrogate these witnesses for the purpose of testing their memory and the extent of their information. See Copley v. Commonwealth, 184 Ky. 185, 211 S. W. 558.

If any of these witnesses had given an affirmative answer to any of these questions, then it would have been the duty of the court to have admonished the jury of the purpose for which these questions were asked; but none of the witnesses had ever heard anything about any of the occurrences, and so far as the record shows, these matters may never have occurred, as no witness offered to say they did occur or did not occur.

On direct examination, G. W. Patrick was asked this question and made the following answer:

"Q. 11. Did you hear him make any statement as to why he shot and killed Grover Sharp? A. I heard him say he didn't know what made him do it."

This could have two meanings. It could mean that what Cox meant to say was that he did not know what made Sharp turn upon him, or, it could mean that Cox meant to say that he was unable to give any reason why he had killed Sharp. The attorneys for the Commonwealth and for the defendant, by their interrogation, each tried to get the witness to state it according to his particular side. Finally, the court suggested that the witness tell as best he remembered, just what was said, whereupon the attorney for the commonwealth asked this question:

"Q. 2. Can you give his words, just as best you can remember? A. He just said, 'I don't know what made me do it' is the way I understood him to say."

When the defendant was introduced as a witness in his own behalf, his counsel asked him this question:

"Q. 178. Did you say there to Mr. Patrick or in his presence and in the presence of the sheriff of this county, 'I don't see what made him do it'?"

The court sustained the Commonwealth's objection to this question, and defendant excepted. This objection was properly sustained, for the reason that the statement contained in the question is not the statement to which Patrick had testified. Patrick testified that Cox said, "I don't know what made me do it," and if defendant's counsel had propounded that question to the defendant, it would have been competent, and he should have been permitted to answer.

Defendant introduced as a witness in his behalf the sheriff of the county, Mr. Young, and on direct examination, asked the sheriff this question:

"Q. 4. Tell the jury if Cox said there in your presence and in the presence of George Patrick, 'I don't know what made me do it.' A. I didn't hear him put it that way."

The objection of the Commonwealth to the question and answer was sustained, and defendant excepted. This objection was properly sustained, as the question was very leading.

If defendant's counsel had asked the witness just what Cox said, the witness should have been permitted to answer the question, but he did no do that.

Defendant's next complaint is that the court erred in refusing to permit him to introduce competent and material evidence, and this evidence consists of a detailed account of the shooting of Cecil Evans by Sharp on the street, his shooting at him three times in the post office, his shooting at him on the street following that, his shooting and wounding him in the barber shop, and his shooting and wounding him after he came out of the barber shop. Defendant insists that the action of the court in refusing to permit the introduction of this evidence was very prejudicial to him, as it tended to show the state of mind of the deceased on this day, and his inclination and willingness to kill, and argues that this evidence should have been introduced, as it would indicate that the defendant was a dangerous man and in a murderous frame of mind, and that on account of that, the defendant was authorized to act on less provocation than he would have been if his adversary had been a quiet, peaceable citizen. The court was not trying Sharp, therefore he properly excluded the details of Sharp's misdoings and only permitted the witnesses to state in a general way that Sharp had had trouble with Cecil Evans and had shot him.

His next complaint is that the Hon. H. H. Tye, who was employed to assist in the prosecution of this case, in his closing argument to the jury in answer to arguments for leniency by counsel for defendant, stated to the jury that there were twenty-nine indictments for murder pending in the Whitley circuit court, to which statement the defendant objected at the time and the court stated to the jury that they would try the case

from the evidence, but failed to admonish the jury or the attorney, to which action the defendant at the time, through his counsel, excepted, and the said employed attorney, in the same argument, after this objection was made, stated to the jury that two Strunks had been convicted in that court at the same term and sent to the penitentiary for life, and both of them were out of the penitentiary within a few years, and that a man had been sent from this county for killing his wife and was out in a few years, to which statements of employed counsel the defendant objected, and the court stated to the jury that they would try this case solely and alone from the evidence of the witnesses from the witness chair, but failed to give the jury any further admonition or admonish the attorney to stay within the record, and to which the defendant at the time objected and excepted. This was said by the prosecutor in an effort to get the jury to inflict the death penalty. The jury did not do so, hence the use of this language did not prejudice the rights of the defendant. Therefore, it makes no difference whether the use of this language was erroneous or not, and we do not pass on that question, for by sections 340 and 353 of the Criminal Code, we have no right to reverse a case except for errors prejudicial to the substantial rights of the defendant.

He further complains of the manner in which the jury was selected, but he made no challenge to the panel, and generally questions of the formation of the jury are not subject to exception. See section 281, Criminal Code. He also complains here of certain alleged misconduct of Mr. Tye, but all of that which is not contained in the bill of exceptions cannot be considered by us. Vanover v. Commonwealth, 203 Ky. 362, 262 S. W. 282.

He also says that he has discovered new evidence, but does not file an affidavit setting out what it is, nor does he file any affidavit of any new witness, so we cannot consider that.

This disposes of all his complaints except this, that the verdict was flagrantly and palpably against the law and the evidence. We cannot agree with him, for according to all the witnesses, except himself, deceased was saying nothing as he walked along the street beside the defendant, just before the shooting. That was natural. The man had run amuck. He had been wounded; he had been overpowered, arrested and disarmed, and was then being taken by the deputy sheriff to a physician to have

his wounds dressed. His wounded left hand was wrapped in some sort of cloth, and he was holding it up. He was left handed. The evidence showed that he ate with his left hand, and did everything usually with that hand. In the condition he was in, with the sheriff beside him, the last thing he would have thought of would have been to have started a brawl. It is evident that the jury did not believe that he started one with defendant, or that he even turned toward the defendant for the purpose of starting a brawl. Sharp had shot Cecil Evans within thirty minutes before this, and it was natural that everybody was looking at him, and quite a number of witnesses saw this shooting. Many of them, and those of them who were nearest to it, say that this shooting occurred at a time when Sharp was walking along saying nothing to defendant; that the defendant drew his pistol, held it in both hands, thrust it into Sharp's left ear and fired; that immediately Sharp began to sink, and that defendant continued to shoot. One of the last shots struck a sign board which was standing on the pavement, and struck it at the edge of the pavement. Cox contends that at the time he shot Sharp he turned on him, and that he shot him first in the chest, and that he continued to shoot just as fast as he could, because he thought Sharp was going to shoot him, and that Sharp did not begin to fall until after the shooting had stopped; but the facts do not support Cox's contention. Sharp's burned ear, the bullet hole in the sign board just at the edge of the pavement are against him.

The judgment is affirmed.